UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

ONEDA ULEE,
     Plaintiff,

vs.                                Case No.: 4:20cv137/EMT

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]
     Defendant.
_____/

## **MEMORANDUM DECISION AND ORDER**

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF No. 12).   It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act (Act) for review of a final determination of the Commissioner of the Social Security Administration (Commissioner) denying Plaintiff's applications for disability insurance benefits (DIB) under Title II of the Act, 42 U.S.C. §§ 401–34, and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381–83.   Upon review of the record before the court, I conclude the findings of fact and determinations of the

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration (SSA) on July 9, 2021.   Pursuant to Fed. R. Civ. P. 25(d), Ms. Kijakazi is automatically substituted for Andrew Saul as the Defendant in this case.

Commissioner are supported by substantial evidence in the record and application of proper legal standards and that the decision of the Commissioner, therefore, should be affirmed.

## ISSUES ON REVIEW

Plaintiff raises two issues on appeal, arguing the ALJ erred in (1) "accept[ing] the non-treating, old opinion of consultative [physical] examiner Dr. Slade," and (2) "failing to adequately consider Dr. Kline's opinion, which indicated that Plaintiff's past work was precluded" from a psychological standpoint (ECF No. 18 at 1).

## PROCEDURAL HISTORY

On October 24, 2017, Plaintiff filed applications for DIB and SSI, alleging disability beginning June 1, 2017, based on problems with her knee, back, and hand/wrist/arm, as well as diabetes, high blood pressure, depression, and carpal tunnel syndrome (tr. 146–47, 157–58, 169–70).[2]  The applications were denied initially and on reconsideration (tr. 169–70, 201–02).   Plaintiff appeared for a hearing before an Administrative Law Judge (ALJ) on June 4, 2019 (tr. 54–91).   On July 3, 2019, the ALJ issued a decision finding Plaintiff not disabled under the Act

---

[2]  The administrative record, as filed by the Commissioner, consists of 828 consecutively numbered pages (*see* ECF No. 16).  References to the record will be by "tr.," for transcript, followed by the page number.  The page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

(tr. 11–37).   Plaintiff petitioned the Appeals Council for review of the ALJ's decision, and the Appeals Council denied the request (tr. 139–44).   The ALJ's decision thus became the final determination of the Commissioner subject to review in this court.   *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007); *see also Walker v. Soc. Sec. Admin., Comm'r*, No. 19-15039, 2021 WL 503280, at *3 (11th Cir. Feb. 11, 2021) ("because the Commissioner has delegated h[er] authority to make the finding at the hearing level to an administrative law judge, the finding is effectively reserved to the administrative law judge").

## FINDINGS OF THE ALJ

In his written decision dated July 3, 2019 (tr. 11–36), the ALJ made the following findings pertinent to the issues raised in this appeal:

- Plaintiff has not engaged in substantial gainful activity since June 1, 2017, the alleged onset date (*id.*).

- Plaintiff has the following severe impairments: osteoarthritis and obesity (*id.*).

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (tr. 19).

- Plaintiff has the residual functional capacity (RFC) to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) (tr. 22).

- Plaintiff is capable of performing past relevant work as a preparation cook, which does not require the performance of work-related activities precluded by Plaintiff's RFC (tr. 33).

- Plaintiff has not been under a disability, as defined in the Act, from June 1, 2017, through July 3, 2019, the date of the decision (tr. 36–37).

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v.*

*Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.   *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'"   *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (citing *Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)).   A reviewing court also may not look "only to those parts of the record which support the ALJ" but, instead, "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983).   Review is deferential to a point, but the reviewing court conducts what

has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[3]

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). An individual claiming Social Security disability benefits must prove she is disabled. *Adams v. Comm'r, Soc. Sec. Admin.*, 586 F. App'x 531, 533 (11th Cir. 2014).

Pursuant to 20 C.F.R. § 404.1520(a)(4) (2012), the Commissioner analyzes a disability claim in five steps.[4]  "Throughout the process, the burden is on the

---

[3] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram*, 496 F.3d at 1260; *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

[4] In general, the legal standards applied are the same whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404.1520, 416.920 (2012)).  Citations in this Memorandum Decision and Order thus should be considered to incorporate the appropriate parallel provisions.  The same applies to citations of statutes or regulations found in quoted court decisions.

claimant to introduce evidence in support of her application for benefits." *Adams*, 586 F. App'x at 533.   The five steps are as follows:

1.   If the claimant is performing substantial gainful activity, she is not disabled.

2.   If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.   If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.   If the claimant's impairments do not prevent her from performing past relevant work, she is not disabled.

5.   Even if the claimant's impairments prevent her from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's RFC and vocational factors, she is not disabled.[5]

---

[5] If the claimant meets her burden at step four, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.   *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).

At step five (or step four in cases in which the ALJ decides a claimant can perform past work), the ALJ formulates an RFC through interpretation of the medical evidence and the claimant's subjective complaints, based on the impairments identified at step two. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2012). "[R]esidual functional capacity is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2012). The ALJ relies on the RFC to make the ultimate vocational determination required by step five.

## FACT BACKGROUND[6]

Plaintiff was fifty-five years old on the alleged onset date (tr. 146). She had a tenth grade education and past work as a preparation cook (tr. 66, 86). At the initial level, Plaintiff alleged disability due to problems with her knee, back, and

---

[6] The recitation of facts set forth below is derived from the administrative record and testimony at the hearing before the ALJ. Moreover, although the timeframe relevant to Plaintiff's claim for DIB is June 1, 2017 (date of alleged onset), through July 3, 2019 (date of the ALJ's decision), and the timeframe relevant to Plaintiff's claim for SSI is October 24, 2017 (date she applied for SSI), through July 3, 2019, the undersigned addresses evidence predating the alleged onset date, recognizing it is of limited relevance. While it is true that in some cases records predating the alleged disability onset date are not relevant to the ALJ's analysis, in other cases, such records may be. Here, the ALJ considered evidence predating the alleged onset date. *See Carmickle v. Astrue*, 533 F.3d 1155, 1165 (9th Cir. 2008) (evidence which predates the alleged period of disability may be of limited relevance); *Lackey v. Barnhart*, 127 F. App'x 455, 458 (10th Cir. 2005) (ALJ should not ignore medical reports simply because they predate the alleged onset of disability); *Hamlin v. Barnhart*, 365 F.3d 1208, 1223 n.15 (10th Cir. 2004) (evidence that predates the alleged onset date may be relevant to claimant's medical history).

hand/wrist/arm, including carpal tunnel syndrome, as well as diabetes, high blood pressure, and depression (tr. 23). At the reconsideration level, Plaintiff asserted increasing back pain (*id.*). Plaintiff alleged the impairments were causing finger cramps and constant knee and low back pain, radiating into the right hip, along with bilateral arm pain that was worse in the right hand (*id.*).

On February 24, 2015, Plaintiff saw Susan Horton, A.R.N.P. at Jefferson Health Department, for a routine, follow-up examination (tr. 679–81).[7] The treatment notes reflect tenderness to the knees bilaterally and pain in the lower posterior leg (tr. 679). Plaintiff was in no apparent distress and had an appropriate mood and affect with no gross motor dysfunction (tr. 679–80). Plaintiff refused prescriptions and imaging, and Horton provided Plaintiff with information regarding national health insurance (tr. 680).

One month later, on March 24, 2015, Plaintiff returned to Jefferson Health Department complaining of pain in both knees and the left hand (tr. 676). She said she had experienced worsening bilateral knee pain for several years and could not

---

[7] Although the record contains medical records pre-dating February 24, 2015, Plaintiff does not rely on treatment records prior to that date. The court thus will begin its recitation of Plaintiff's medical history with treatment notes from the February 24, 2015, visit. *See* ECF No. 17 (advising the parties they "must file and serve a memorandum setting forth concisely the basis for affirming or reversing the final decision of the Commissioner and a <u>detailed</u> analysis of the administrative record, with citation of authorities in support of the party's position and to the administrative record") (emphasis in original).

afford x-rays (tr. 677).   She reported that over-the-counter medications did not provide relief, but she again refused prescriptions (tr. 678).   Plaintiff's mood and affect were appropriate, and there was no gross motor dysfunction (*id.*).   On examination, Horton observed bilateral knee tenderness with crepitus and left hand tenderness (*id.*).   She noted a history of left thumb trigger finger (*id.*).   Horton initiated a We Care Referral for x-rays (*id.*).

Plaintiff next saw Horton on April 29, 2015, again complaining of left hand and bilateral knee pain (tr. 672–73).   Plaintiff apparently did not respond when asked to rate the severity of her pain (tr. 672).   Notes reflect tenderness to the left hand and knees but a steady gait (tr. 673).   Horton ordered lab work due to complaints of pain in the left hand (tr. 674).   Plaintiff complained of worsening depression despite taking Celexa (*id.*).   She was in no apparent distress, however, and had an appropriate mood and affect with no gross motor dysfunction (tr. 673).   Horton switched Plaintiff from Celexa to Paxil to treat depression (tr. 674).

When Plaintiff saw Horton on May 27, 2015, for a routine follow-up examination, she rated her pain a zero out of ten (tr. 669–70).   She nevertheless complained of pain in the left hand and knees, and Horton observed tenderness in those locations (*id.*).   Horton advised Plaintiff that We Care required further documentation before it would perform imaging and encouraged Plaintiff to provide

the information and also to obtain health insurance (tr. 670–71).   Plaintiff requested pain medication (tr. 671).   She denied depression, was in no apparent distress, and again had an appropriate mood and affect with no gross motor dysfunction (tr. 669–70).

Plaintiff saw Horton on June 17, 2015, for dental problems (tr. 667–68). Plaintiff's pain level was still a zero (tr. 667).   The notes reflect no joint abnormalities or swelling and full range of motion with 5/5 muscle strength in all extremities (*id.*).   Plaintiff was in no apparent distress and exhibited an appropriate mood and affect with no gross motor dysfunction (tr. 668).

Left hand x-rays from June 22, 2015, revealed scattered, relatively mild degenerative changes with findings most pronounced at the distal interphalangeal joints, especially the fifth finger (tr. 732).   Bilateral knee x-rays performed the same day revealed medial lateral joint space loss with similar, but less pronounced, findings at each retro patellar joint space but no fracture dislocation or suprapatellar joint effusion (tr. 733).   The impression was degenerative changes (*id.*).

On August 6, 2015, Plaintiff saw Horton for right jaw pain (tr. 664–65).   She reported pain at a level four (tr. 664).   As usual, she was in no apparent distress and had a normal mood and affect with no gross motor dysfunction (tr. 665).

On September 18, 2015, George Slade, M.D., conducted a consultative physical examination of Plaintiff (tr. 553–64).   Plaintiff reported low back pain radiating down the right leg following a 2006 motor vehicle accident (tr. 553).   She also reported bilateral knee and hand pain with a tingling and shocking sensation in the hands (*id.*).   She had a straight leg raise of eighty-five degrees in both the sitting and supine positions (tr. 554).   She complained of depression with past thoughts of suicide, for which she took citalopram (tr. 553).

Dr. Slade indicated it was "difficult to obtain" information from Plaintiff because of severe pain in Plaintiff's left eye at the time of the examination, which distracted Plaintiff (*id.*).   Dr. Slade assessed acute corneal ulcer or abrasion with conjunctivitis, which he characterized as an "ocular emergency" to be resolved on September 23; back pain without objective abnormality; bilateral carpal tunnel syndrome without motor involvement; bilateral knee pain with equivocal effusion of the left knee without ligamentous laxity or abnormal knee exam; diabetes mellitus for the past twenty years; tingling paresthesia of extremities without objective sensory changes (including hypoactive Achilles reflexes suggesting an evolving neuropathy); controlled hypertension; and obesity (tr. 554).

On September 21, 2015, Robert Kline, III, Psy.D., conducted a consultative psychological examination of Plaintiff (tr. 569).   Dr. Kline noted Plaintiff did not

maintain friendships outside of family but enjoyed fishing and going to church (tr. 570). Plaintiff indicated she had difficulty sleeping—both falling asleep and staying asleep (*id.*). She tended to her own hygiene, but her grandchildren performed household chores and maintenance (*id.*). Plaintiff reported that citalopram was helpful in controlling symptoms of depression but that she still had breakthrough depression and anxiety (tr. 571).

Dr. Kline noted that during the course of the interview, Plaintiff generally maintained fair to minimally adequate eye contact (*id.*). He described Plaintiff as sullen and disinterested, presenting with a flat and dysthymic affect, but not overly defiant or defensive (*id.*). Dr. Kline indicated the conversation consisted of Plaintiff responding to direct questions and stated there were no instances of spontaneous speech (*id.*). According to Dr. Kline, Plaintiff's speech was "slow but normal in rate and tone, poorly articulated, but readily understood" (*id.*).

Dr. Kline found Plaintiff's thought expression generally rational and logical, although simple and concrete (*id.*). He observed no loosening of associations, rambling speech, or delusional thinking, and Plaintiff's verbal structure was logical and relevant (*id.*). Plaintiff was fully oriented, able to attend to the interview without distraction, and showed no significant decline in attention during the course of the interview (*id.*). She was easily able to identify four common items, although

she was unable to spell the word "world" forward or backward (tr. 571).   Plaintiff "denied significant or bothersome memory problems" and was able to remember three simple words after latency periods of one, five, and fifteen minutes without difficulty (*id.*).   Dr. Kline noted no deficits with regard to posture or gait, no unusual mannerisms or repetitive gestures, and appropriate motor activity (*id.*).   Dr. Kline assessed recurrent, moderate major depressive disorder but opined Plaintiff did not "appear to have an emotional or psychiatric issue that would preclude her from performing simple, repetitive tasks, remembering and following directions, or interacting appropriately with coworkers, supervisors, and the public" (tr. 571–72).

Dr. Kline completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on September 28, 2015 (tr. 575–77).   Dr. Kline indicated Plaintiff had marked limitation in understanding, remembering, and carrying out complex instructions; making judgments on complex work-related decisions; and responding appropriately to usual work situations and changes in routine work setting (tr. 575–76).   He indicated moderate limitation in carrying out simple instructions; making judgments on simple work-related decisions; and interacting appropriately with the public, supervisors, and coworkers (*id.*).

In response to an inquiry from the SSA, Dr. Kline later clarified, by letter dated November 24, 2015, that he intended to indicate that Plaintiff was

"experiencing depressive symptoms that will likely have a noticeable negative impact on her functioning" (tr. 583). He explained he intended to "indicate that [Plaintiff's] mood issues [would] interfere with her functioning" in the areas of "mental flexibility, focus, concentration, memory and completion of rote behaviors, as well as motivation" but not that "her mood symptoms [would] preclude her capabilities in these areas" (*id.*). Dr. Kline noted he "did not indicate her issues are 'extreme' in any of the areas" but felt "her impairment [was] more significant than would be indicated by a finding of 'moderate' which is defined on the form as 'able to function satisfactorily'" (*id.*). Dr. Kline opined Plaintiff's "functioning in a competitive occupational capacity [would] be limited [because Plaintiff] may not be able to meet the limitations set forth by some employers" but that Plaintiff "is NOT incapable of being successful in her occupational pursuits" (*id.*) (emphasis in original).

On May 28, 2016, Plaintiff visited the emergency room, complaining of pain in the back, knee, and upper right leg that was "Mild (-moderate)" (tr. 593). Bending, moving, twisting, and walking exacerbated the pain (*id.*). Plaintiff reported that a burning pain in her upper right leg had recently worsened (tr. 594). The provider, Dr. Warren R. Blount, observed mild lumbar paraspinal tenderness and lumbar spasm (tr. 597). Imaging of the lumbar spine showed normal vertebral

heights and alignment at all levels and no fracture or malalignment (tr. 602).   Dr. Blount assessed chronic low back pain with right-sided sciatica and bilateral chronic knee pain, for which he prescribed Ultram, Robaxin, and meloxicam (tr. 599).

Plaintiff saw Dannette Turner, A.R.N.P. at Jefferson Health Department, on June 9, 2016, for follow-up and to review lab results (tr. 655, 658).   Plaintiff complained of back and knee pain but reported relief "at intervals" since presenting to the emergency room (tr. 655).   She rated the pain, which treatment notes indicate caused slow movement, an eight out of ten (tr. 655, 658).   Plaintiff also reported muscle/joint problems for the past year and pain and stiffness for the past three weeks (tr. 655).   Turner indicated there was abnormal curvature—kyphosis—of the spine but no joint abnormalities or swelling (tr. 657).   Plaintiff denied depression, was in no apparent distress, and had an appropriate mood and affect, good eye contact, logical thought process, appropriate thought content, and intact short- and long-term memory (tr. 656–58).   She was able to follow directions and demonstrated no gross motor dysfunction and an appropriate gait (tr. 658).   With regard to depression, Turner noted paroxetine seemed to be helping; she also noted meloxicam "help[ed] a little" for pain (tr. 659).   Turner encouraged Plaintiff to purchase knee supports, which Plaintiff could "find at [a] dollar store or Walmart,"

and use warm compresses, as needed; she assessed uncontrolled diabetes, osteoarthritis of multiple joints, and depressive disorder (tr. 658–59).

Plaintiff saw Turner again on September 8, 2016, for a follow-up examination and medication refills (tr. 646, 649).   Plaintiff reported nerve pain in the hands and feet, which she rated an eight out of ten (tr. 646).   Treatment notes indicate a history of depression and arthritis (*id.*).   Plaintiff apparently reported muscle/joint problems and stiffness for the past year but denied muscle pain (*id.*).   The notes reference back and knee pain but indicate no joint abnormalities and full range of motion with 5/5 muscle strength in all extremities (tr. 648).   Plaintiff was in no apparent distress, denied depression, and had an appropriate mood with normal speech, logical thought process, appropriate thought content, and intact short-term memory (tr. 647–49). Turner noted Plaintiff was taking paroxetine for depression, which seemed to be helping (tr. 649).   Turner assessed depressive disorder, osteoarthritis of multiple joints, hypertension, uncontrolled diabetes, peripheral neuropathy, and vitamin D deficiency but found no functional impairment (tr. 649–50).

 Plaintiff next saw Turner on January 5, 2017, to review lab results and for medication refills (tr. 637, 640).   Turner recorded a history of depression, arthritis, back pain, vitamin D deficiency, and hyperlipidemia (tr. 637).   Plaintiff reported muscle/joint pain and stiffness, including in her back; nerve pain/tingling and

numbness to the hands and feet; and depression (tr. 637–38, 640).   She complained of back pain, which she rated an eight, and said she had constant knee pain (tr. 638). She had no joint abnormalities and full range of motion with 5/5 muscle strength in all extremities (tr. 637, 639).   Plaintiff requested pain medication (tr. 642).   Turner decided to try Plaintiff on Neurontin and increase the dose of meloxicam (tr. 640). Plaintiff again was in no apparent distress and had an appropriate mood and affect with no gross motor dysfunction (tr. 638, 640).   Turner again assessed no functional impairment (tr. 640).

When Plaintiff saw Turner on May 11, 2017, to review lab results and for mediation refills, she had "[n]o new problems" but the "[s]ame aches and pains" (tr. 628, 631).   Plaintiff indicated she had back pain, pain and stiffness in the muscles and joints, and tenderness in the knee, which was "[l]imited with pain" (tr. 628, 630). She reported tingling and numbness in the hands and feet, although she was taking Neurontin and the condition was improving (tr. 631).   Plaintiff also was taking meloxicam and Robaxin "with some relief" (tr. 632).   Plaintiff rated the pain a six out of ten and requested mediation (tr. 628).   Turner encouraged Plaintiff to wear a knee brace daily for support (tr. 632).   Plaintiff denied depression (tr. 629). According to the treatment notes, paroxetine "seem[ed] to be helping" in that regard (tr. 632).   Plaintiff exhibited appropriate mood and affect, good eye contact, logical

thought process, appropriate thought content, and intact short- and long-term memory; she also was able to follow directions (tr. 630).   Plaintiff was in no apparent distress and had no functional impairment (tr. 629, 631).

Plaintiff saw Turner again on August 31, 2017, for a follow-up examination, test results, and medication refills (tr. 619, 621).   Plaintiff had knee and back pain but no joint abnormalities or swelling (tr. 621).   She rated the pain a one out of ten (tr. 619).   As usual, Plaintiff denied depression, was in no apparent distress, and had an appropriate mood and affect with no gross motor dysfunction (tr. 620–21). Turner again assessed no functional impairment (tr. 621).

Plaintiff returned to Turner for another follow-up visit on November 9, 2017, on which date she reported pain at a level five (tr. 604–05).   Again, Plaintiff was in no apparent distress and denied muscle/joint pain and swelling (tr. 610–11).   She had full range of motion with 5/5 muscle strength in all extremities, although she complained of back pain and stiffness and requested pain medication (tr. 612–13). Plaintiff denied depression and demonstrated an appropriate mood and affect with no gross motor dysfunction (tr. 611–12).   Turner assessed no functional impairment (tr. 612).

It appears Plaintiff's next follow-up visit with Turner was on February 22, 2018, when Plaintiff went for lab results and rated her pain a 6 out of 10 (tr. 737).

With regard to depression, Turner indicated Plaintiff's score on the PHQ, a questionnaire that helps medical professionals assess the degree of depression, was a two, indicating minimal depression (tr. 738).[8]

X-rays of the right knee performed on April 9, 2018, revealed no fracture or dislocation (tr. 731).   The bony structures appeared intact (*id.*).   There were no acute findings and no significant changes from the last radiographs on June 22, 2015 (*id.*).   Lumbar x-rays performed the same day likewise were unremarkable (tr. 730). The vertebral body heights appeared normal (*id.*).   The alignment appeared good (*id.*).   There was no indication of fracture or dislocation, "either recent or old," and no pars inter articularis defects or spondylolisthesis (*id.*).   There was no significant change from the last lumbar spine x-ray performed on October 8, 2013 (*id.*).

When Plaintiff saw Turner on April 19, 2018, for a breast exam and mammogram, she apparently did not respond when asked to rate the severity of her pain (tr. 747–48).   She again denied musculoskeletal problems, although Turner noted arthritis; she also again denied depression, was in no apparent distress, and had no functional impairment, with full range of motion and muscle strength in all

---

[8] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.

extremities (tr. 754–56).   Turner assessed a PHQ score of two and noted Plaintiff

had an appropriate mood and affect and no gross motor dysfunction (tr. 748, 756).

On May 3, 2018, during another follow-up visit to review lab results and

obtain medication refills, Plaintiff reported pain at a level zero; she also "[d]enie[d]

any new problems" (tr. 814).   Once again, Plaintiff was in no apparent distress,

denied musculoskeletal problems, and had no abnormalities or functional

impairment, with full range of motion and 5/5 muscle strength in all extremities (tr.

821–23).   Plaintiff denied depression, and Turner noted an appropriate mood and

affect with no gross motor dysfunction (tr. 821, 823).   Turner once again assessed

a PHQ score of two (tr. 815).

On May 17 and June 6, 2018, Plaintiff saw Turner to review mammogram and

ultrasound results (tr. 796–97, 803–04).   During both visits, Plaintiff reported pain

at a level zero (tr. 796, 803).   Although notes from the June 6 visit are less detailed,

notes from the May 17 visit indicate Plaintiff was in no apparent distress, denied

musculoskeletal problems, and had no musculoskeletal abnormalities, with full

range of motion and 5/5 muscle strength in all extremities (tr. 803, 810–11).

Plaintiff also denied depression on May 17 and had an appropriate mood and affect

with no gross motor dysfunction and no functional impairment (tr. 810, 812).   On

both occasions, Turner assigned a PHQ score of two (tr. 797, 804)

Plaintiff saw Turner on June 14, 2018, to discuss a breast biopsy (tr. 786–87). Plaintiff again did not respond when asked to rate the severity of her pain (*id.*). She was in no apparent distress, however, and denied musculoskeletal problems and depression (tr. 793–94). Plaintiff likewise declined to rate her pain during an August 23 follow-up visit for review of lab work and medication refills, when Turner again noted a PHQ score of two (tr. 774–75).

During a December 6, 2018, visit, Plaintiff reported pain at a level zero (tr. 758). Treatment notes nevertheless reflect pain and stiffness in the muscles/joints, along with "achy bones knees, back pain" (tr. 766, 768). Plaintiff denied depression, was in no apparent distress, and demonstrated an appropriate mood and affect, with no gross motor dysfunction and no functional impairment (*id.*). Turner once again assigned a PHQ score of two (tr. 760).

Plaintiff testified to her alleged limitations at the hearing before the ALJ. At the time of the hearing, Plaintiff was fifty-seven years old, stood 5'1" tall, and weighed 195 pounds (tr. 65). Plaintiff testified she completed the tenth grade and had past work as a preparatory cook, which was a "standing job" (tr. 66–67). When asked what "impairment or physical condition" prevented her from working, Plaintiff responded "I get hurt all the time. My whole body hurt[s] . . . ." (tr. 67–68). The ALJ questioned Plaintiff as to the cause of the pain, and Plaintiff said she

did not know because she had not "been going to the doctor like [she] should" because she did not have Medicaid (tr. 68).   Plaintiff said she did not "know what's going on, but [she] kn[e]w a normal body don't hurt like [hers]" (*id.*).   The ALJ explained that Plaintiff had to establish a medically determinable impairment for which there was a cause (*id.*).   In response, Plaintiff testified "I can't work" (*id.*).

 When asked what the doctors said was wrong with her, Plaintiff responded that she told people at "the health department about [her] back and stuff" and that they said her sugar was "out of whack" (*id.*).   Plaintiff confirmed she had been diagnosed with diabetes and explained that when she saw her provider and her "sugar [was] down," the provider would tell her that she did not know why she was hurting and prescribe medication, which did not work but did "ease [the pain] a little bit" (*id.*).   Plaintiff testified her doctors diagnosed carpal tunnel syndrome and advised "[t] hat's why it hurt[s]" (*id.*).   Plaintiff also testified she had arthritis (tr. 69).

The ALJ asked Plaintiff if she had any pain associated with her alleged conditions, and Plaintiff responded in the affirmative (*id.*).   The ALJ asked Plaintiff to describe the pain (*id.*).   Plaintiff responded, "[i]t just feel[s]—in my back, it feel[s] like something be stabbing me in my back, and my knees, too.   That's how my knees is, too.   My right one—left one" (*id.*).   When asked about the severity of the pain, Plaintiff said at night, it's "real strong" and in the day it hurts, "but [not as]

bad as at night" (tr. 69).   Plaintiff said she was unable to sleep in a bed and had to sleep in a chair instead (*id.*).   The ALJ asked Plaintiff to rate the pain, as experienced during the day time (*id.*).   Plaintiff said it was "about a five" all day (*id.*).   The ALJ then asked Plaintiff whether her current medications relieved the pain (tr. 70).   Plaintiff said they did not (*id.*).

When asked how long she could stand, Plaintiff said "[a]bout 30 minutes" (tr. 72).   The ALJ asked Plaintiff how many hours she thought she could stand in an eight-hour day, assuming she could get up, move around, take breaks, and sit down, and Plaintiff responded, "[a]bout two" (tr. 72–73).   Plaintiff said she could sit down "probably for an hour" at a time and "about three, four" hours in an eight-hour day, again assuming she could get up, move around, and take breaks (tr. 73).   She could bend "a little bit, but not all the way down" (*id.*).   When questioned as to how long she could walk at any one time, Plaintiff responded, "I walk[ed] one day from my house to my sister['s] house, but I had to keep sitting down.   That was probably about a[n] hour" (*id.*).   She said she could walk "[a]bout a block" at a time (*id.*).   When pressed as to the length of time she could walk without a break, Plaintiff initially said she did not know and then said "[p]robably about 30 minutes" (tr. 73–74).   Assuming she could get up, move around, take breaks, and sit down, Plaintiff

said she thought she could walk for a total of about two hours in an eight-hour day (tr. 74).   And she could carry a maximum of "about 20" pounds (*id.*).

The ALJ turned to Plaintiff's activities of daily living.   Plaintiff testified she got up around 9:00 in the morning and went to bed around midnight (*id.*).   She ate breakfast around 10:00 or 11:00 and then watched television until around noon (tr. 74–75).   She ate lunch around 1:00 or 2:00, although she did not "really have a set time" (tr. 75).   Between the time she ate lunch until around 5:00 or 6:00, she mostly watched television (*id.*).   Plaintiff said she ate dinner around 5:00 and would then watch television until she went to bed (*id.*).   She sat in a recliner while watching television—for approximately eight hours a day (tr. 75–76).

The ALJ asked Plaintiff what chores she performed on a regular basis (tr. 75).   Plaintiff responded that she did not "really have to do too much, because [her] children mostly [did] it" (*id.*).   She said she did not cook but "sometimes" washed dishes (*id.*).   She did not iron, sweep, or mop—her children did "that kind of stuff for [her]" (*id.*).   She also did not vacuum or wash clothes, the latter of which her sister did for her (tr. 76).   She shopped once a month (*id.*).   Plaintiff testified she did not go to church, visit people, attend sporting events, or work in the yard or garden (*id.*).   She said she had problems being around a lot of people—ten or more

(tr. 72).   She said she could not deal with anyone but was able to handle some stress and pressure (*id.*).

The ALJ asked Plaintiff whether she had been treated for a mental problem (*id.*).   Plaintiff said she had and that it had "been about—some years ago" (*id.*). She could not recall the doctor's name (*id.*).   In response to questioning from her counsel regarding symptoms of depression, Plaintiff testified she "just ha[d] panic attacks and stuff like that" and "told her [doctor] [she] used to drive" (tr. 83). Plaintiff explained she "used to drive everywhere," but as of the time of the hearing, she could not "drive like [she] used to" and did not "drive that far" anymore due to panic attacks (*id.*).

A vocational expert, Regina Kitzmiller, also testified at the hearing (tr. 83–84).   Ms. Kitzmiller identified Plaintiff's past work as preparation cook, which Ms. Kitzmiller characterized as "SVP 2, unskilled, with a medium physical demand level, per the DOT, and performed at the light physical demand level, as reported by the Claimant" (tr. 86).   The ALJ asked Ms. Kitzmiller if the record and Plaintiff's testimony indicated Plaintiff performed the job of preparation cook as the job is generally performed in the national economy and consistent with the DOT (*id.*). Ms. Kitzmiller testified Plaintiff performed the job at a lighter basis than the job generally is performed (*id.*).

The ALJ then posed a hypothetical question to Ms. Kitzmiller, asking Ms. Kitzmiller to assume an individual of Plaintiff's age, education, and past relevant work experience who could perform medium work (tr. 86–87). The ALJ asked Ms. Kitzmiller whether such an individual could perform Plaintiff's past work (tr. 87). Ms. Kitzmiller testified such an individual could work as a preparation cook, "both per the DOT and as performed by the Claimant" (*id.*). The ALJ then asked whether such an individual could perform other work that existed in the national economy (*id.*). Ms. Kitzmiller responded in the affirmative and testified such an individual could work as a linen room attendant, day worker, and hand packager, all of which are medium, unskilled jobs with SVP levels of two (*id.*).

## DISCUSSION

I.   Opinion of Dr. Slade, a Non-treating Physician

As indicated above, Plaintiff first argues the ALJ erred in his "decision to accept the non-treating, old opinion of consultative examiner Dr. Slade" (ECF No. 18 at 11). On January 18, 2017, the SSA revised its medical evidence regulations, including by

> redefining several key terms related to evidence, revising . . . rules about acceptable medical sources (AMS), revising how [the SSA] consider[s] and articulate[s] . . . consideration of medical opinions and prior administrative medical findings, revising . . . rules about medical consultants (MC) and psychological consultants (PC), revising . . . rules

about treating sources, and reorganizing [its] evidence regulations for ease of use.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)). [9]   The revised regulations went into effect on March 27, 2017, before Plaintiff filed her applications for DBI and SSI, and thus apply to Plaintiff's claims. *See id.*

Among other changes, the revised regulations redefine how evidence is categorized, specifying five categories of evidence: (1) objective medical evidence, (2) medical opinion, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical finding.   *See* 20 C.F.R. § 416.913(a) (2017). [10]   Pertinent for purposes of this matter, the revised regulations define "medical opinion" as follows:

---

[9] As the SSA explained,

> [t]hese revisions conform our rules to the requirements of the Bipartisan Budget Act of 2015 (BBA), reflect changes in the national healthcare workforce and in the manner that individuals receive medical care, and emphasize the need for objective medical evidence in disability and blindness claims.   We expect that these changes will simplify our rules to make them easier to understand and apply[] and allow us to continue to make accurate and consistent disability determinations and decisions.

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132 (Mar. 27, 2017)).

[10] *Compare with* 20 C.F.R. § 416.912(b)(1) (2016).

A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .

(A)     Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)

(B)     Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(C)     Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(D)     Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 416.913(a)(2) (2017).   In revising the definition of "medical opinion," the SSA recognized that "[d]iagnoses and prognoses do not describe how an individual functions" and that although the SSA considers a claimant's statements about his or her symptoms, "[a] more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and limitations."   81 Fed. Reg. at 62,562; *see also* 20 C.F.R. § 416.913(a)(2), (3) (2017).[11]

---

[11] By contrast, the prior regulations provided that statements from an acceptable medical source reflecting judgments about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis, and prognosis, were considered "medical opinions."   20 C.F.R. § 416.927(a)(2) (2016); *id.* at § 416.927(a)(1) (2017).

"Other medical evidence" includes "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3) (2017). "Evidence from nonmedical sources" includes "any information or statement(s) from a nonmedical source (including [the claimant]) about any issue in [the] claim." 20 C.F.R. § 416.913(a)(4) (2017). The SSA "may receive evidence from nonmedical sources either directly from the nonmedical source or indirectly, such as from forms [the SSA] receive[s] and [its] administrative records." *Id.*

> A prior administrative medical finding is a finding, other than the ultimate determination about whether [the claimant is] disabled, about a medical issue made by [a] Federal [or] State agency medical [or] psychological consultant[] at a prior level of review (see § 416.1400) in [the] current claim based on . . . review of the evidence in [the] case record, such as:
>
> > (i) The existence and severity of [the claimant's] impairment(s);
> > (ii) The existence and severity of [the claimant's] symptoms;
> > (iii) Statements about whether [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1;
> > (iv) If [the claimant is] a child, statements about whether [the claimant's] impairment(s) functionally equals the listings in Part 404, Subpart P, Appendix 1;

(v) If [the claimant is] an adult, [the claimant's] residual functional capacity;

(vi) Whether [the claimant's] impairment(s) meets the duration requirement; and

(vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to [the] claim.

20 C.F.R. § 416.913(a)(5) (2017).

The revised regulations also significantly alter the manner in which an ALJ is to consider and articulate findings regarding medical opinions. *See* 20 C.F.R. § 416.920c (2017). Under the revised regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a) (2017). "When a medical source provides one or more medical opinions . . . , [the ALJ] will consider those medical opinions . . . from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of [§ 416.920c], as appropriate." *Id.* Those factors include the following:

(1) supportability;
(2) consistency;
(3) relationship with the claimant, which includes
    (i) length of the treatment relationship
    (ii) frequency of examinations
    (iii) purpose of the treatment relationship
    (iv) extent of the treatment relationship
    (v) examining relationship;
(4) specialization; and
(5) other factors.

20 C.F.R. § 416.920c(a)–(c) (2017).

Under the revised regulations, supportability and consistency "are the most important factors" the ALJ considers when determining the persuasiveness of a medical source's medical opinions.  20 C.F.R. § 416.920c(b)(2) (2017).  As the SSA recognized, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be" and, similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. § 416.920c(c)(1) and (2) (2017).  Accordingly, the ALJ now must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] . . . decision."  20 C.F.R. § 416.920c(b)(2) (2017).

The ALJ "may, but [is] not required to, explain how he considered the factors in paragraphs (c)(3) through (c)(5) . . . , as appropriate, when . . . articulat[ing] how [he] consider[ed] medical opinions . . . in [the] case record."  20 C.F.R. § 416.920c(b)(2) (2017).  When the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must "articulate how [he]

considered the other most persuasive factors . . . for those medical opinions. . . ."
20 C.F.R. § 416.920c(b)(3) (2017).   The revised regulations deem statements on
issues reserved to the Commissioner, including statements that a claimant is or is not
disabled, "inherently neither valuable nor persuasive to the issue of whether [a
claimant is] disabled . . . ."   20 C.F.R. § 416.920b(c)(1)–(3) (2017).   In fact, the
regulations dispense with any analysis of the consideration of such evidence.   *See*
20 C.F.R. § 416.920b(c) (2017).

Turning to the medical opinion at issue in this case, as set forth above, the
ALJ found "Dr. Slade's assessment that reflects the claimant can perform medium
exertion" to be "very persuasive overall," noting "Dr. Slade was an examining
neurologist, and while his opinions [were] four years old, [they were] consistent with
the current medical records" and "also well supported by his own clinical
examinations and testing, as discussed above, and . . . generally consistent with the
record as a whole" (tr. 31).   As the ALJ observed, when Plaintiff saw Dr. Slade on
September 18, 2015, for a consultative neurological examination, she had been
experiencing severe left eye pain for two days, as a result of which it was difficult
for Dr. Slade to obtain information from her (tr. 29).   Dr. Slade noted, however, that
Plaintiff reported back and knee pain that rendered her unable to bend, stand, or walk
for significant periods of time (*id.*).   Specifically, Plaintiff complained of constant,

sharp pain, including chronic low back pain with a burning sensation from the waist down the right leg since a 2006 motor vehicle accident (tr. 29). She also complained of bilateral knee pain and hand pain with tingling paresthesia and an electric shock sensation in both hands (*id.*). Plaintiff indicated she quit working in 2012 because she could no longer stand long enough to perform the duties of her job (*id.*).

Upon examining Plaintiff, Dr. Slade found the spine to be within normal limits, with no tenderness or paraspinal muscle spasm; he also found active range of motion within normal limits in the extremities (tr. 29). Plaintiff's joints were within normal limits as well, with no atrophy or edema, and her "gait revealed a synergistic swing, which [likewise] was within normal limits, and no antalgia" (*id.*). Plaintiff refused to attempt tandem, tiptoe, and heel walking (*id.*).

At the time of the examination, Plaintiff's grip strength was 3/3 bilaterally; during a June 15 visit with her primary care physician—only a little more than three months before Dr. Slade's examination—however, Plaintiff's grip strength was 5/5 (tr. 29). Plaintiff's straight leg raise was eighty-five degrees in both the sitting and supine positions, and Plaintiff had normal motor strength and sensory abilities (*id.*). Plaintiff's deep tendon reflexes were 2+ throughout, except for the Achilles, which was 1+ (*id.*). Plaintiff's Babinski responses were normal, and Plaintiff had normal

range of motion of the cervical spine, lumbar spine, shoulders, elbows, wrists, hands, hips, knees, ankles, and feet (tr. 29).

As set forth above, Dr. Slade diagnosed acute corneal ulcer or abrasion with conjunctivitis, back pain without objective abnormality, bilateral carpal tunnel syndrome without motor involvement, bilateral knee pain with equivocal effusion of the left knee without ligamentous laxity or abnormal knee examination, diabetes mellitus, tingling paresthesia of the extremities without objective sensory changes, controlled hypertension, and obesity (tr. 29). Dr. Slade found no significant impairment of physical function and opined Plaintiff had no limitation of functional capacity other than in the left eye, which resolved within five days of Dr. Slade's examination (*id.*).

Dr. Slade opined Plaintiff could continuously lift or carry up to twenty pounds and occasionally lift or carry up to fifty pounds; sit for five hours at a time and up to eight hours during an eight-hour day; and stand and walk for four hours at a time and up to eight hours in an eight-hour day (tr. 30). Dr. Slade concluded Plaintiff did not require the use of a cane to ambulate and could continuously use her hands for handling, fingering, feeling, pushing and pulling, and reaching in all directions and continuously use her feet for pushing and pulling leg controls (*id.*). Dr. Slade further opined Plaintiff could continuously climb, balance, stoop, kneel, crouch, and

crawl; work around unprotected heights; be around moving machinery and operate motor vehicles; and work around humidity, wetness, extreme heat and cold, dust, odors, fumes, pulmonary irritants, and loud noise (tr. 30).

Prior to Dr. Slade's examination, on October 8, 2013, Dr. Wayne Sampson of Cross Creek Medical performed the first consultative examination of Plaintiff (tr. 28). Dr. Sampson noted Plaintiff reported constant low back pain since her automobile accident, which she described as non-radiating and an eight out of ten "most of the time" (*id.*). The pain intensified upon walking half a mile, standing for half an hour, sitting in one position for more than twenty to twenty-five minutes, bending over, stooping, squatting, and carrying anything over fifteen to twenty pounds for more than ten to fifteen feet (*id.*). Plaintiff reported she had been experiencing persistent pain in the knees for several years, but she denied swelling and instability (*id.*). Plaintiff indicated the pain worsened with all weight bearing activities lasting more than ten to fifteen minutes, but she stated she got mild back and knee pain relief from over-the-counter non-steroidal anti-inflammatory drugs (*id.*). Lumbar x-rays performed the day Dr. Sampson examined Plaintiff were unremarkable (tr. 730).

Neurological examination revealed that Plaintiff's reflexes were 1+ in the biceps and 2+ in the patellar (tr. 730). Plaintiff's motor strength was 5/5

throughout, including hand grip, and she had dexterity of the hands (tr. 730).
Sensory examination revealed that light touch, stereognosis, and proprioception
were within normal limits (*id.*).   Plaintiff had a normal gait and was able to stand
and walk on her heels and toes (*id.*).

Dr. Sampson's musculoskeletal examination revealed that Plaintiff was able
to get up from a seated position, as well as on and off the examination table, without
difficulty (tr. 730).   There was no tenderness or spasm in the neck or paraspinal
muscles and no pain with range of motion (*id.*).   Dr. Sampson observed no
appreciable spinal deformity, and there was no pain with flexion or extension and
no tenderness or spasm (*id.*).   Straight leg raises were negative in the sitting and
supine positions (*id.*).   There was no heat, swelling, effusion, or ligament laxity in
the knees and no tenderness or pain with range of motion (*id.*).   Range of motion of
the cervical spine, lumbar spine, and all joints was within normal limits (*id.*).   Dr.
Sampson diagnosed chronic pain in the low back and knees, Type II diabetes
mellitus, and "depression that was improved with treatment" (*id.*).

The ALJ found "[t]hese consistent reports [i.e., of Drs. Slade and Sampson],
clinical observations, and objective findings provide strong support for the medium
exertion level found in the [assigned RFC]" (tr. 30).   Substantial evidence supports
the ALJ's finding in that regard.   Indeed, as set forth above, there simply is no

objective medical evidence in the record to substantiate Plaintiff's claim of disabling impairments.   In fact, as the ALJ stated, "[t]he medical record reflects improvement in [Plaintiff's] medical condition" after Dr. Slade conducted his examination on September 18, 2015 (tr. 32).

As the ALJ observed, "[t]hroughout 2016, 2017, and 2018, examinations at the Jefferson County Health Department reflect[ed] . . . no abnormalities or swelling" (tr. 32).   Plaintiff "had full range of motion [in] all [four] joints[,] and muscle strength was 5/5 in all extremities" (*id.*).   "In September 2016, January 2017, May 2017, August 2017, November 2017, and April 2018, [Plaintiff] was assessed with no functional impairment" (*id.*).   "In 2015, x-rays of [Plaintiff's] knees revealed some bilateral medial lateral joint space loss but no fracture, dislocation, or super patella joint effusion," which "initially [was] interpreted as degenerative changes" (tr. 32–33).   Subsequent x-rays of Plaintiff's right knee showed no fracture or dislocation, intact bony structures, and no acute findings (tr. 33).   "[I]n 2018, x-rays of the lumbar spine appeared normal"; alignment also "appeared good with no fracture or dislocation" (*id.*).   And "[t]here was no spondylolisthesis" (*id.*).   Hence, "[t]here are no diagnostic studies to show abnormalities that could reasonably be expected to produce symptoms near the disabling level of severity" (*id.*).

Put simply, as the ALJ found, "the objective findings in this case do not provide strong support for the claimant's allegations of disabling symptoms and limitations" (tr. 24).   The ALJ's finding that "[t]he record does not reveal the existence of any severe, underlying impairment generally associated with the intractable, unrelenting, and totally disabling pain, which the claimant alleges," thus is supported by substantial evidence in the record (tr. 33).   Accordingly, the undersigned finds the ALJ did not err in finding Dr. Slade's opinion "very persuasive overall" (tr. 31).

II.     Dr. Kline's Opinions

Substantial evidence also supports the ALJ's finding that depression was not a severe impairment (tr. 15).[12]   In his decision, the ALJ recognized that Plaintiff "ha[d] the medically determinable mental impairment of a depressive disorder" (*id.*). The ALJ found, however, that such disorder did "not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work-related activities" and thus was non-severe (*id.*).   As the Commissioner explains, an impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities.   *See* 20 C.F.R.§§ 404.1522(a), 416.922(a) (2017).   Here, as

---

[12]  As the Commissioner points out, under the revised regulations, opinions of state agency medical and psychological consultants are now deemed prior administrative medical findings rather than medical opinions.

the ALJ noted, "the record [does] not show any consistent and severe mental restrictions, psychological findings, or medical source statements that equated to significant limitations" resulting from Plaintiff's non-severe mental impairment (*id.*).

As set forth above, in May 2017, Turner observed appropriate mood and affect, good eye contact, logical thought process, intact long- and short-term memory, and intact insight and judgment (tr. 630).  Turner continued to observe appropriate mood and affect, and Plaintiff repeatedly denied depression (tr. 611–12, 620–21, 629, 754, 756, 793, 810, 812, 821, 823).  In December 2018, Plaintiff's score on the PHQ was a two—which, as stated above, indicated minimal depression (tr. 760).

The prior administrative medical findings of two state agency psychological consultants also support the ALJ's finding that depression did not constitute a severe impairment (tr. 15).  Dr. Adrine McKenzie and Dr. Alan Harris, state agency psychological consultants, reviewed the record in 2018 and opined that Plaintiff's mental impairment was not severe (tr. 154–55, 196–99).  The ALJ found the opinions of Dr. McKenzie and Dr. Harris "well supported by, and consistent with, the overall record" and thus "extremely persuasive" (tr. 15, 31).

The revised regulations recognize that state agency medical and psychological consultants are highly qualified and experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (2017) (citing §§ 404.1520b, 404.1520c, 404.1527, 416.920b, 416.920c, 416.927).   Under the revised regulations, ALJs are not required to adopt prior administrative medical findings, but they must consider such evidence in accordance with the Commissioner's regulations, as appropriate.   *See* 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (2017).   As with other opinions of record, the ALJ must consider the factors of consistency and supportability in evaluating the persuasiveness of such findings. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017).   Here, the ALJ considered the consultants' findings, explained he found them persuasive, and considered the required factors in assessing their persuasiveness (tr. 15, 31).   As the ALJ explained, while Dr. McKenzie and Dr. Harris were not treating sources, their opinions were well-supported by citations to the record and consistent with the record as a whole (tr. 31, 154–55, 196–99).

The only evidence that even arguably supports Plaintiff's claim of a severe mental impairment is Dr. Kline's consultative opinions rendered between September and November 2015, which the ALJ characterized, correctly, as "varying," and found "only somewhat persuasive" (tr. 15).   Dr. Kline offered "multiple medical

opinions, with follow-up clarification, after completing a psychological examination of Plaintiff" (tr. 15).   "During her exam on September 21, 2015, [Plaintiff] reported that her depression began long before the onset of her physical symptoms from the automobile accident"; she also reported a history of panic attacks (*id.*).   Dr. Kline noted that although Plaintiff was "not receiving therapeutic services," she was "being maintained on a regimen of psychotropic medication that include[d] the antidepressant Citalopram" (*id.*).   Dr. Kline further noted that Plaintiff took the medication as prescribed and reported that it was helpful in controlling her symptoms, although she had breakthrough depression and anxiety (*id.*).   Plaintiff had never received inpatient psychiatric treatment, and there was no indication she failed any grade or was placed in special education classes (*id.*).

Plaintiff described her mood to Dr. Kline as "all right" (tr. 16).   She presented as flat and dysthymic, "sullen and rather disinterested in the interview session" (*id.*). Her thoughts, however, were "generally rational and logical, [although] simple and concrete" (*id.*).   "There was no loosening of associations, rambling speech, or delusional thinking evidence, and [she] expressed verbal structure and was logical and relevant" (*id.*).   "With regard to concentration and orientation, she was able to attend to the interview without distraction, and no significant decline in attention was noted as the interview progressed" (*id.*).   She was "fully oriented and easily

able to identify four common items, [although] she could not spell 'world' forward or backward" (tr. 16).  "With regard to memory, she denied significant or bothersome memory problems and . . . was able to remember three simple words after latency periods of 1, 5, and 15 minutes without difficulty" (*id.*).  There was no indication of past or present hallucinations (*id.*).  As the ALJ observed, "Dr. Kline diagnosed [Plaintiff] with a moderate recurrent major depressive disorder and opined that, based on the immediate evaluation, she d[id] not appear to have an emotional or psychiatric issue that would preclude her from performing simple, repetitive tasks, remembering and following directions, or interacting appropriately with coworkers, supervisors, and the public" (*id.*).

On September 28, 2015, Dr. Kline completed a Mental Residual Functional Capacity evaluation in which he indicated Plaintiff had a mild inability to understand and remember simple instructions; a moderate inability to carry out simple instructions, use judgment in simple one- or two-step work-related decisions, and respond appropriately to customers, the general public, supervisors, and coworkers; and a marked inability to understand, remember, and carry out complex instructions, use judgment in complex work-related decisions, and deal with changes in a routine work setting (tr. 16, 575–76).

A couple of months later, on November 24, 2015, Dr. Kline provided a response to an inquiry by an ALJ, clarifying that, in his opinion, Plaintiff's impairment was more significant than would be indicated by a finding of "'moderate,'" which Dr. Kline noted was defined on the form as "'able to function satisfactorily'" (tr. 16–17, 583).   As previously noted, Dr. Kline opined that Plaintiff's "'functioning in a competitive occupational capacity [would] be limited, and she may not be able to meet the limitations set forth by some employers, but she is NOT incapable of being successful in her occupational pursuits'" (tr. 17) (emphasis in original).

The ALJ found Dr. Kline's opinions unsupported by Dr. Kline's examination notes, which indicated Plaintiff's symptoms were managed with psychotropic medication (tr. 15, 569).   *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (2017)) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be.").   The ALJ also found Dr. Kline's opinions inconsistent with Dr. Kline's notes regarding Plaintiff's memory, attention, and concentration, all of which Dr. Kline found to be intact (tr. 18, 571). *See id.*   The ALJ further found Dr. Kline's opinions inconsistent with the treatment records of Plaintiff's primary care provider, A.R.N.P. Turner, which showed

Plaintiff routinely denied depression in 2017 and 2018 and exhibited appropriate mood and affect (tr. 17–18, 611–12, 620–21, 629, 754, 756, 793, 810, 812, 821, 823).   *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2017) ("The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be.").   In fact, as the ALJ observed, "[w]hile Dr. Kline found a major depressive disorder when [he] examined [Plaintiff] in 2015, [Plaintiff] . . . had no follow-up psychological treatment after being diagnosed with depression" (tr. 17). And again, in May, August, and December 2018, Plaintiff's PHQ score was a two, indicating minimal depression (tr. 17).   Lastly, the ALJ found Dr. Kline's opinions inconsistent with Plaintiff's presentation at the hearing and reports of receiving no inpatient psychiatric treatment, frequently spending time with family, watching television daily, and performing household chores (tr. 15, 17–18, 72, 75–76, 378–79, 381, 386–89, 570).

Plainly, as required under the revised regulations, the ALJ articulated his consideration of Dr. Kline's opinions according to the regulatory factors—most importantly, consistency and supportability.   *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2017).   The undersigned finds that the ALJ's determination that Dr.

Kline's opinions were only "somewhat persuasive" is supported by substantial evidence in the record and application of proper legal standards.

Finally, Plaintiff argues the ALJ should have ordered a consultative psychological examination during the relevant period (ECF No. 18 at 19–21).[13] Plaintiff's argument is unpersuasive.   As set forth above, Plaintiff "bears the burden of proving that [s]he is disabled, and, consequently, . . . is responsible for producing evidence in support of h[er] claim."   *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. §§ 404.1512, 416.912 (2017).   Moreover, the ALJ had sufficient evidence to render a decision, as a result of which a consultative examination was unnecessary.   *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (2012) (stating an ALJ may order a consultative examination if the record as a whole is insufficient to allow him to make a decision); *see also Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir. 2001) ("The regulations 'normally require' a consultative examination only when necessary information is not in the record and cannot be obtained from the claimant's treating medical sources or other medical sources") (quoting 20 C.F.R. § 404.1519a(b) (2012)).   And there are no evidentiary inconsistencies in the record necessitating a consultative examination.   *See* 20

---

[13] As the Commissioner points out, in so arguing, Plaintiff relies on the regulations prior to their revision.

C.F.R. §§ 404.1519a(b), 416.919a(b) (2012) (stating an ALJ may order a consultative exam to try to resolve an inconsistency in the evidence).   Finally, the Eleventh Circuit has held there must be a showing of prejudice for the reviewing court to remand the case to the Commissioner for further development of the record. *See Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995).   A showing of prejudice requires a showing the ALJ did not have all of the relevant evidence of record before him or did not consider all of the evidence of record in reaching his decision.   *See Kelley v. Heckler*, 761 F.2d 1538, 1540–41 (11th Cir. 1985).   Plaintiff has made no such showing.

<u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence in the record and application of proper legal standards and, hence, that the decision should affirmed.[14]   *See Carnes v. Sullivan,* 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

---

[14] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review.   *See Moore*, 405 F.3d at 1208.

Accordingly, it is **ORDERED**:

1.      The clerk of court is directed to substitute Kilolo Kijakazi for Andrew Saul as Defendant in this case.

2.      The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

3.      The clerk of court is directed to enter **JUDGMENT** pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the decision of the Commissioner and close the file.

At Pensacola, Florida this <u>30th</u> day of September 2021.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**